Joseph A. Cardella, [CA State Bar No. 185524]
**THE LAW OFFICE OF JOSEPH A. CARDELLA**
3324 Seaclaire Drive
Rancho Palos Verdes, California 90275
Ph: (310) 595-4482

Attorney for Plaintiff,
THOMAS HRONIS

FILED
2012 SEP -7 AM 11: 11
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| THOMAS HRONIS, an Individual,<br><br>    Plaintiff,<br><br>vs.<br><br>U.S. BANCORP, a Delaware Corporation, and DOES 1-10 Inclusive,<br><br>    Defendants | Federal Case No. CIV12-06076 JFW (Ex)<br>State Case No. EC056404<br><br>**FIRST AMENDED COMPLAINT FOR:**<br>1) **BREACH OF CONTRACT;**<br>2) **NEGLIGENT VIOLATION OF FAIR CREDIT REPORTING ACT;**<br>3) **HARASSMENT**<br>4) **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS;**<br><br>Complaint Served: June 14, 2012<br>Action Removed: July 13, 2012<br>Current Response Date: August 17, 2012 |

Plaintiff, THOMAS HRONIS alleges as follows:

This action arises out of and relates to the wrongful conduct by Defendants concerning a business line of credit, including but not limited to, breach of contract, violation of Fair Credit Reporting Act (15 U.S.C. §1681 et seq.), intentional infliction of emotional distress by Defendants, and harassment of the Plaintiff by Defendants while Plaintiff was in Chapter 7 Bankruptcy proceedings.

### I.   JURISDICTION AND VENUE

1.   Venue for this action properly lies in the United States District Court Central District of California – Western Division based on subject matter and diversity jurisdiction. Specifically, the allegations concerns federal issues pertaining to violations of the Fair Credit

1. Reporting Act (15 U.S.C. §1681 et seq.) and the Parties reside in different states, Plaintiff resided in California at the time this action was brought and, on information and belief, Defendant U.S. BANCORP is a Delaware Corporation.

## II. PARTIES

2. Plaintiff, THOMAS HRONIS ("HRONIS"), is, and at all times relevant times herein alleged was an individual residing in Los Angeles County, California and acting as the president of Camden Technologies, Inc ("Camden").

3. Defendant, U.S. BANCORP, on information and belief, is, and at all times relevant times herein alleged was a Delaware Corporation, that was authorized to conduct business and was conducting business in the State of California, including providing services as a lender to business entities.

4. Plaintiff, unaware of the true names, capacities, or basis for liability of defendants DOES 1 through 10, inclusive, and therefore sues said defendants by their fictitious names. Plaintiffs will amend this complaint to allege their true names, capacities, or basis for liability when the same has been ascertained. Plaintiff is informed and believes and thereon alleges that defendants DOES 1 through 10, inclusive, and each of them, are in some manner liable to Plaintiff. Unless specifically indicated otherwise, reference to U.S. BANCORP includes by reference DOE defendants 1 through 10.

5. U.S. BANCORP and DOE defendants 1 through 10 are hereinafter collectively referred to as "DEFEDANTS."

6. At all times relevant to this action, each of the DEFENDANTS, including those fictitiously named, was the agent, servant, employee, partner, joint venturer, or surety of the other DEFENDANTS and was acting within the scope of said agency, employment, partnership, venture, or suretyship, with the knowledge and consent or ratification of each of the other DEFENDANTS in doing the things alleged herein.

## III. ALLEGATIONS COMMON TO ALL CUASES OF ACTION

7. On or about July of 2008, Camden entered into an agreement with DEFENDANTS entitled "Cash Flow Manager Line of Credit Agreement and Terms with

Guaranty" ("Agreement"). Attached hereto as **Exhibit "A"** to this First Amended Complaint is a true and correct copy of the Agreement.

8. The Agreement provided that the DEFENDANTS would provide a line of credit to Camden in the amount of $25,000.

9. Under the terms of the Agreement, DEFENDANTS took a security interest in Camden's accounts receivable.

10. Plaintiff executed the Agreement as the business owner and guarantor.

11. The Agreement did not specifically refer to or specifically waive any of Plaintiffs' rights as a guarantor as expressly set out under California *Civil Code* §§2787 through 2855.

12. On information and belief, DEFENDANTS advanced approximately $23,000 in the line of credit funds to Plaintiff pursuant to the Agreement.

13. Camden consistently and timely made all payments required of it pursuant to the Agreement from the time it entered into the Agreement in July of 2008 up through and including May 2011.

14. As of June 5, 2011 HRONIS had no delinquencies on his credit with the credit bureaus, including Transunion, Equifax and Experian.

15. Camden did not make a payment in June for the May period for which payment was due on the line of credit pursuant to the Agreement.

16. On or about July of 2011, DEFENDANTS sent notification to Camden via U.S. Postal Service that the June payment for the May period was 30 days past due.

17. On information and belief, DEFENDANTS never made any efforts to pursue the security interest or otherwise pursue Camden in anyway for its debt under the Agreement.

18. On or about July of 2011, DEFENDANTS, on information and belief, reported to some or all of the credit bureaus, including Transunion, Equifax and Experian that HRONIS was past due and in default on a personal loan.

19. On information and belief, some or all of the credit bureaus, including Transunion, Equifax and Experian recorded the default sent by DEFENDANTS as a delinquency and default by HRONIS on a person loan.

20. On information and belief, there is no other negative reporting to the three credit bureaus Transunion, Equifax and Experian between June 2011 and July, when DEFENDANTS wrongly reported to some or all of the credit bureaus, including Transunion, Equifax and Experian that he had defaulted on a personal loan.

21. On information and belief, HRONIS' credit was downgraded from good to a negative "D" and "F" as a direct and proximate result of the reporting by DEFENDANTS and for no other reason.

22. On information and belief, prior to reporting HRONIS to the credit bureaus, DEFENDANTS never made any efforts to pursue HRONIS in anyway for Camden's debt under the Agreement and DEFENDANTS did not demand, request, in any way, or otherwise notify HRONIS that Camden was delinquent on payment under the Agreement.

23. HRONIS was ultimately forced to file for bankruptcy due to the actions taken by DEFENDANTS and did file for Chapter 7 Bankruptcy.

24. HRONIS listed the debt from the Agreement in his bankruptcy filings.

25. The Bankruptcy status for HRONIS never changed. It was filed as a Chapter 7 case, processed as a Chapter 7 case and discharged as a Chapter 7 case.

26. While in Bankruptcy proceedings, DEFENDANTS, without leave of the bankruptcy court or otherwise any right to do so continued to pursue HRONIS as the guarantor for Camden's debt under the Agreement.

### IV. FIRST CAUSE OF ACTION FOR BREACH OF CONTRACT
(By Plaintiff HRONIS against all DEFENDANTS)

27. Plaintiff realleges and incorporates by reference each and every allegation of the above paragraphs 1 through 26 inclusive, as if fully set forth herein.

28. As of the time of the breach of the Agreement by DEFENDANTS, Plaintiff had performed all conditions, covenants, and promises required by it on its part to be performed in accordance with the terms and conditions of the Agreement.

29. Every contract has an implied duty of good faith and fair dealing. DEFENDANTS breached the contract by, among other things, failing to notify HRONIS of the

default nature of the debt before taking any action against Camden, wrongfully reporting the debt on the Agreement as a personal debt, failing to pursue the secured interests that it had in Camden's business and provide HRONIS with an offset of any amounts that

30. As a result of said breaches of the Agreement, Plaintiff, as of the filing of this Complaint, has been damaged in the sum of $25,000 and in such additional sums as will be proved at trial.

31. As a further direct and proximate result of the foregoing breach, Plaintiff has been required to, and has, retained the firm of The Law Offices of Joseph A. Cardella to represent it in connection with this matter. The exact amount of attorney fees to be incurred by Plaintiff is presently unknown to Plaintiff. The Agreement provides for the recovery of attorney's fees. Plaintiff is entitled to recover reasonable attorney fees incurred in bringing and prosecuting this action, as determined by the court.

## V. NEGLIGENT VIOLATION OF FAIR CREDIT REPORTING ACT
(By Plaintiff HRONIS against all DEFENDANTS)

32. Plaintiff realleges and incorporates by reference each and every allegation of the above paragraphs 1 through 33 inclusive, as if fully set forth herein.

33. DEFENDANTS had a duty to properly hire, train and educate all bank personnel so as to prevent any violation of HRONIS' rights under the Fair Credit Reporting Act (15 U.S.C. §1681 et seq.) ("FCRA").

34. On or about July of 2008, after learning of the actions taken by DEFENDANTS, HRONIS contacted DEFENDANTS via telephone to advise them that, among other things, the DEFENDANTS had violated FCRA by wrongfully and inaccurately reporting to the credit bureaus, failing to pursue its secured interests in Camden first and provide HRONIS with an offset of any amounts to which he was entitled and by refusing to correct the wrong and inaccurate reporting to the credit bureaus.

35. DEFENDANTS refused to correct the errors in its reporting to the credit bureaus and told HRONIS that even if the amounts that Camden owed under the Agreement were paid that DEFENDANTS would make no effort or otherwise attempt to correct any inaccurate or

PLAINTIFF'S FIRST AMENDED COMPLAINT

wrongful reporting of HRONIS that it had engaged in with the credit bureaus or pursue any security interest that it had in Camden.

36. As a result of said violations of FCRA, Plaintiff, as of the filing of this Complaint, has been damaged in the sum of $175,000 and in such additional sums as will be proved at trial.

37. As a further direct and proximate result of the foregoing negligent violation of FCRA, Plaintiff has been required to, and has, retained the firm of The Law Offices of Joseph A. Cardella to represent it in connection with this matter. The exact amount of attorney fees to be incurred by Plaintiff is presently unknown to Plaintiff. The Agreement provides for the recovery of attorney's fees. Plaintiff is entitled to recover reasonable attorney fees incurred in bringing and prosecuting this action, as determined by the court.

## VI. HARASSMENT
(By Plaintiff HRONIS against all DEFENDANTS)

38. Plaintiff realleges and incorporates by reference each and every allegation of the above paragraphs 1 through 37 inclusive, as if fully set forth herein.

39. DEFENDANTS were advised by HRONIS that he had filed for Chapter 7 Bankruptcy and that there was a stay in place preventing DEFENDANTS from pursuing any further collection actions against HRONIS or continuing to litigate this matter.

40. Despite the foregoing, while HRONIS was in Chapter 7 Bankruptcy proceedings, DEFENDANTS intentionally and knowingly continued in their collection efforts against HRONIS and continued to litigate the instant matter while HRONIS was in Bankruptcy proceedings.

41. As a result of said violations of FCRA and refusal to correct the violations as well as the continued collection and litigation efforts by DEFENDANTS while HRONIS was in Chapter 7 Bankruptcy proceedings, Plaintiff, as of the filing of this Complaint, has been damaged in the sum of $25,000 and in such additional sums as will be proved at trial.

42. As a further direct and proximate result of the foregoing harassment, Plaintiff has been required to, and has, retained the firm of The Law Offices of Joseph A. Cardella to represent

it in connection with this matter. The exact amount of attorney fees to be incurred by Plaintiff is presently unknown to Plaintiff. The Agreement provides for the recovery of attorney's fees. Plaintiff is entitled to recover reasonable attorney fees incurred in bringing and prosecuting this action, as determined by the court.

### VII. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
(By Plaintiff HRONIS against all DEFENDANTS)

43. Plaintiff realleges and incorporates by reference each and every allegation of the above paragraphs 1 through 42 inclusive, as if fully set forth herein.

44. DEFENDANTS knowingly and/or recklessly engaged conduct that included DEFENDANTS' wrongfully and inaccurately reporting HRONIS' credit history to one or all of the three major credit bureaus, including Transunion, Equifax and Experian, DEFENDANTS' refusal to correct the wrongfully and inaccurately reporting HRONIS' credit history once it was brought to DEFENDANTS' attention and even though HRONIS stated that he would pay the debt, and DEFENDANTS' continued collection efforts against HRONIS and continued to litigation the instant matter after HRONIS advised DEFENDANTS that HRONIS had filed for Chapter 7 Bankruptcy.

45. As a direct result of the foregoing extreme and outrageous conduct on the part of DEFENDANTS, HRONIS has suffered severe emotional distress.

46. As a result of said intentional infliction of emotional distress, Plaintiff, as of the filing of this Complaint, has been damaged in the sum of $175,000 and in such additional sums as will be proved at trial.

47. As a further direct and proximate result of the foregoing intentional infliction of emotional distress, Plaintiff has been required to, and has, retained the firm of The Law Offices of Joseph A. Cardella to represent it in connection with this matter. The exact amount of attorney fees to be incurred by Plaintiff is presently unknown to Plaintiff. The Agreement provides for the recovery of attorney's fees. Plaintiff is entitled to recover reasonable attorney fees incurred in bringing and prosecuting this action, as determined by the court.

///

PLAINTIFF'S FIRST AMENDED COMPLAINT

# VIII. **PRAYER**

**WHEREFORE,** Plaintiff prays for judgment for the following:

<u>AS TO THE FIRST CAUSE OF ACTION:</u>

1. For compensatory damages in the sum of $25,000 or according to proof at time of trial;

<u>AS TO THE SECOND CAUSE OF ACTION:</u>

1. For compensatory damages in the sum of $175,000 or according to proof at time of trial;

<u>AS TO THE THIRD CAUSE OF ACTION:</u>

1. For compensatory damages in the sum of $50,000 or according to proof at time of trial;
2. For punitive damages in the amount of $200,000;

<u>AS TO THE FOURTH CAUSE OF ACTION:</u>

1. For compensatory damages in the sum of $175,000 or according to proof at time of trial;
2. For punitive damages in the amount of $200,000;

<u>AS TO ALL CAUSES OF ACTION:</u>

1. For any applicable reasonable attorney's fees awardable pursuant to any agreement, statute and/or by law;
2. For the costs of bringing the suit;
3. For such other relief as the Court deems just and proper.

DATED: August 16, 2012

THE LAW OFFICES OF JOSEPH A. CARDELLA

By: [signature]

Joseph A. Cardella

Attorney for Plaintiff, THOMAS HRONIS

# EXHIBIT "A"

Cash Flow Manager Line of Credit Agreement and Terms with Guaranty



**CASH FLOW MANAGER LINE OF CREDIT
AGREEMENT AND TERMS WITH GUARANTY**

| U.S. Bank® Cash Flow Manager | | Borrower (Exact Legal Name) |
|---|---|---|
| Account Number: | 3000663977 | Camden Technologies |
| Note Date: | 07/29/2008 | 2612 Nottingham Ave |
| Credit Limit: | $25,000.00 | Los Angeles, CA 90027-1041 |
| Tax ID Number: | 91-2115150 | |
| Advance Account: | 000153459698186 | Type of Organization: Corporation |
| Payment Account: | 00001534596981B6 | State of Registration: CA |
| Credit Limit not to exceed $100,000 | | Date Current Owner Began: 03/01/2001 |
| | | Gross Annual Sales: $1,900,000.00 |

This Agreement provides the general terms and conditions applicable to the U.S. Bank Cash Flow Manager Line of Credit ("Line of Credit"). "Borrower" refers to the business that was granted the Line of Credit. "Guarantor" refers to each individual, individually and collectively, who sign this Agreement individually and on behalf of the Borrower. "Payment Account" means the business checking account designated for automatic payments. "Advance Account" means the business checking account designated for overdraft protection, online banking, and telephone transfers. The term "Agreement" means these terms and conditions, and any guaranties, security agreements, addenda, confirmation statements, and any other documents and instruments previously, now or later executed by or delivered to Borrower or any Guarantor in connection with the Line of Credit, all taken together as one agreement.

1. **The U.S. Bank Cash Flow Manager Line of Credit.** Subject to the terms and conditions of this Agreement, Lender may at its discretion make Advances (collectively "Advances") to Borrower under the Line of Credit. Borrower may borrow under the Line of Credit, partially or wholly repay its outstanding Advances, and request additional Advances; provided that Lender shall always have the discretion to decline to make any Advance as otherwise provided in this Agreement.

2. **Credit Limit.** The aggregate principal amount outstanding at any one time under the Line of Credit shall not exceed Borrower's approved credit limit of $25,000.00. Lender reserves the right to periodically re-evaluate the Borrower's Line of Credit and, based on Lender's criteria for determining the likelihood of repayment, increase or decrease the Credit Limit without advance notice to Borrower and without notice to any Guarantor. "Credit Limit" means the maximum principal amount as that amount is increased or decreased from time to time in accordance with this Agreement, and such amount shall never exceed $100,000.

3. **Optional Advances.** Each Advance shall be made at the sole option of Lender. Lender is not committed to lend any amounts to Borrower.

4. **Purpose.** Advances shall be used solely to provide short-term working capital for Borrower and for Borrower's general business purposes.

5. **Advances.**
   a. **Amount of Each Advance.** Each Advance must be in a minimum principal amount equal to the lesser of (i) $100 or (ii) the amount available under the Credit Limit (the "Minimum Amount") and may be for a greater amount up to the amount available under the Credit Limit.
   b. **Periodic Finance Charge**
      (i) The finance charge for any day in a Billing Cycle is computed by multiplying the actual daily principal balance of the Advances for that day times the daily periodic rate for the Billing Cycle. The finance charge on the Advances for a Billing Cycle is equal to the sum of the interest finance charges for each day in the Billing Cycle. For purposes of this Agreement, "Billing Cycle" means the monthly period designated by Lender from time to time as the "Billing Cycle".
      (ii) The annual percentage rate for the Advances during a Billing Cycle is the Wall Street Journal Prime Rate plus 2.000%. "Wall Street Journal Prime Rate" means the highest Prime Rate (U.S.) published in The Wall Street Journal "Money Rates" table on a particular date. It is equal to the highest Prime Rate (U.S.) first published during the month in which the Billing Cycle begins. "Interest Rate Margin" means the percentage margin over the Wall Street Journal Prime Rate, and may change from time to time in accordance with this Agreement. The daily periodic rate for a particular day is equal to the annual percentage rate for that day divided by 360. The daily periodic and annual percentage rates will change on the first day of each calendar month in which the Wall Street Journal Prime Rate on such date is different from the Wall Street Journal Prime Rate on the first day of the previous calendar Month and on any date on which the Interest Rate Margin shall be adjusted in accordance with this Agreement. If the first day of a particular calendar month falls

   on a Saturday, Sunday or legal holiday, the date of determination for purposes of adjusting the daily periodic and annual percentage rates for that month shall be the immediately preceding business day.
      (iii) ☐ If checked, an introductory rate applies to this Line of Credit. The introductory variable rate of N/A will end N/A. After the introductory rate period, the rate will adjust to the interest rate specified in Section 5 b (ii).
      (iv) The initial Interest Rate Margin will be based upon payments on the Advances being made by automatic debit from a business deposit account that Borrower maintains with Lender or an affiliate bank approved by Lender. If for any reason Borrower's payments by automatic debit from an account with Lender or one of its approved affiliates are canceled, Lender may increase the Interest Rate Margin by up to a half of one percent (0.50%) per annum, without advance notice to Borrower and without notice to any Guarantor. This provision shall not limit the ability of the Lender to change the Interest Rate Margin upon notice to Borrower in accordance with any other provisions of this Agreement.

6. **Payment Schedule**
   a. On Day 25 of each month and each consecutive month thereafter, Borrower shall pay to Lender at least the Minimum Payment Due. The Minimum Payment Due is an amount equal to the sum of the Current Minimum Payment plus any past due amounts. The Current Minimum Payment is the greater of (i) the sum of (A) 2.500% of all principal owing with respect to the Advances, plus (B) all accrued insurance premiums for Credit Life and Disability Insurance, if applicable, plus (C) all outstanding fees, less past due amounts, or (ii) $100. If the Minimum Payment Due would otherwise be more than the outstanding balance of principal, interest, insurance premiums for Credit Life and Disability Insurance and fees (the "New Balance"), then the Minimum Payment Due is equal to the New Balance.
   b. The principal balance of all Advances, together with accrued but unpaid interest on such Advances and all outstanding fees and charges, shall be payable ON DEMAND given by Lender to Borrower. If the Line of Credit is canceled for any reason by either party or by operation of this Agreement, the principal balance of the Advances outstanding on the date of cancellation and all accrued interest on all Advances, together with all outstanding fees and charges, shall be immediately due and payable.
   c. Notwithstanding the foregoing provisions, the principal balance of all outstanding Advances and accrued interest thereon, together with all outstanding fees and charges, shall be automatically due and payable, without presentment, demand, protest or further notice of any kind, all of which are hereby waived, if any bankruptcy, insolvency or receivership proceedings, or an assignment for the benefit of creditors shall be commenced under any federal or state law by or against any Borrower.

Page 1 of 7



Form #ACAP CFAWEUSBR01 04/2008

d. Except as otherwise restricted by applicable law, payments received by Lender on the Line of Credit shall be applied in such order as Lender shall determine from time to time.

7. **Requests for Advances.** Advances may be requested by the following means. Requests for Advances shall be subject to any applicable processing deadlines as may be established by Lender and any affiliate bank.

   a. **In Person.** Advances may be requested in person at Lender or an affiliate bank.

   b. **Telephone.** If Borrower has designated an Advance Account, Borrower may request Advances by calling U.S. Bank Business Solutions toll free at (800) 673-3555 (Minneapolis/St. Paul call 651-244-7770). Advances made pursuant to a telephone request will be deposited to Borrower's Advance Account. Each Advance requested by telephone must be for at least $100 and may be for a greater amount up to the amount available under the Credit Limit. Lender need not honor Borrower's telephone instructions unless Borrower correctly gives Lender such identifying information, if any, as Lender may request. Notwithstanding any other provision of this Agreement, Lender may decline to honor any telephone transfer request or may cancel Borrower's telephone transfer privileges at any time. Lender's phone banking features include ordering additional convenience checks for Borrower's line of credit, transferring funds to advance Borrower's line and to receive historical transaction data and current balance information.

   c. **Online Banking.** If Borrower has been granted online banking privileges with Lender or any affiliate bank approved by Lender, and Borrower designated an Advance Account in this Agreement, Borrower may request Advances via online banking in accordance with any applicable procedures established by Lender and such affiliate bank(s) from time to time. Advances made pursuant to an online banking request will be deposited to Borrower's Advance Account. Each Advance requested by Internet banking must be for at least $100 and may be for a greater amount up to the amount available under the Credit Limit. Lender need not honor Borrower's Internet borrowing instructions unless Borrower correctly provides such identifying information, if any, as Lender and any applicable affiliate bank(s) may request. Notwithstanding any other provision of this Agreement, Lender or any applicable affiliate bank may decline to honor any Internet request for an advance of Advance proceeds or may cancel Borrower's Internet banking privileges at any time.

   d. **Convenience Checks.** Advances may be requested by using the special "U.S. Bank Cash Flow Manager Convenience Checks" Lender provides to Borrower ("Convenience Check"). The Convenience Checks will be mailed out separately. The amount of each Convenience Check will be an Advance on the day it is presented to Lender and paid. The Convenience Checks may be used like ordinary checks by any one of the person(s) authorized to request Advances in this Agreement. Each Convenience Check must be written for a minimum of $100, and may be written for a greater amount up to the amount available under the Credit Limit of the Line of Credit. Notwithstanding any other provision of this Agreement, Lender may decline to honor any Convenience Check at any time.

   e. **VISA® Card.** Advances may be requested through the use of a special U.S. Bank VISA credit card ("Card") issued by Lender. Borrower may request Advances through use of the Card wherever VISA cards are accepted. Borrower agrees to the terms specified in Section 23 of this agreement concerning the use of the Card. Your card and personal identification number ("PIN") to access your line of credit will be mailed to you in separate mailings.

   f. **Overdraft Protection.** If Borrower applies for automatic overdraft transfer privileges (as indicated below), and Borrower has designated an Advance Account, Lender may at its option make Advances to Borrower's Advance Account when checks drawn on such account result in an overdraft of that account. Borrower hereby authorizes Lender to make an Advance to the specified Advance Account in increments of $100 or the unused portion of your credit line, if that is less. Therefore, a request for an uneven amount will be rounded to the next higher $100 in most cases. If at any time an Advance in an amount sufficient to pay the overdraft would cause the aggregate principal balance of the Advances to exceed the Credit Limit, Lender may, in its sole discretion, either dishonor or pay the check or checks which create such overdraft, and Borrower shall pay all overdraft, non-sufficient funds ("NSF") and other applicable business deposit account charges. Notwithstanding any other provisions of this Agreement, Lender may decline to make any Advance to cover an overdraft in Borrower's Advance Account or may cancel Borrower's overdraft protection privileges under this Agreement at any time.

   ☒ If checked, Borrower authorizes Lender to link Authorized Deposit Account #000153459698186 to this Line of Credit for Overdraft Protection, Online Banking and Telephone Transfers, as applicable.

8. **Authority.** Advances may be requested by any Borrower or any person who signs this Agreement as a representative of Borrower. Lender is authorized to process any requests for an Advance made by any person who represents that such person is authorized to request Advances, including any person who uses the Card or signs or uses Convenience Checks, and Borrower agrees that Lender shall have no obligation to verify the identity of any such person. Borrower assumes all risks of the validity and authorization of such requests. Borrower shall pay to Lender the principal amount and finance charges and other amounts due hereunder, even if Advances may have been requested by a person(s) not authorized to do so. Notwithstanding the foregoing, Lender may require any person requesting an Advance to provide such identifying information as Lender requests.

9. **Maintenance of Checking Account; Payment by Automatic Debit.** Borrower agrees to maintain an Authorized Deposit Account (identified below) with Lender or an affiliate approved by Lender at all times while this Agreement is in effect. If Borrower ceases to comply with this requirement, this Agreement may be automatically canceled by Lender without advance notice to Borrower and without notice to any Guarantor, and upon such cancellation all amounts owing under this Agreement will be immediately due and payable. Borrower hereby authorizes Lender to automatically deduct the amount of all payments from Borrower's Advance Account or Payment Account. If there are insufficient funds in Borrower's Advance Account and Payment Account to pay the required payment, Borrower agrees to pay all fees on the account, which result from the automatic deductions, including any overdraft and NSF charges and any returned payment fee. If for any reason Lender does not charge the Advance Account or Payment Account for payment, or if an automatic payment from either of such accounts is reversed, the payment is still due according to this Agreement. The number of withdrawals from the Advance Account or Payment Account may be limited, as set out in the customer agreement for that account. Lender may cancel the automatic deduction at any time in its discretion.

   ☒ Borrower authorizes Lender to deduct this Line of Credit minimum payment each month from Authorized Deposit Account #000153459698186 on the payment due date specified in Section 6a.

10. **Advances Exceeding Credit Limit.** Notwithstanding any other provisions of this Agreement, in the event Lender honors any request for a Advance after cancellation of this Agreement or which results in Borrower's Credit Limit being exceeded, Borrower will be liable to Lender for and agrees to pay any such Advances, together with interest at the applicable rate, plus any applicable fees and charges, upon demand by Lender.

11. **Default Rate.** Upon the failure of Borrower to timely pay any amounts due hereunder, whether by demand or otherwise, Lender may, at its option, without advance notice to Borrower and without notice to any Guarantor, increase the annual percentage rate applicable to the Advances by up to 10% per annum over the annual rate that would otherwise be in effect under the terms of this Agreement. However, such rate will not exceed the maximum rate permitted by applicable law.

12. **Late Charge.** A Late Fee of 5% of the delinquent amount will be charged if the payment is not received within 5 calendar days of the due date. If the 5-day period expires on a Saturday, Sunday or legal holiday, the fee will be charged on the next business day.

13. **Fees and Charges**

   a. Borrower shall pay to Lender an annual fee in the amount of $150.00 on 7/29/2009 and any ongoing periodic fees established from time to time in accordance with this Agreement.

   b. For each payment made by Borrower to Lender that is returned or rejected (such as a check that is returned unpaid, or an automated transfer that is rejected), Borrower shall pay Lender a returned payment fee of $25.00.

   c. If Lender refuses to honor a Convenience Check because Lender's payment thereof would cause the principal balance of the Line of Credit to exceed the Credit Limit, or because sufficient credit under the Line of Credit is not available for any reason whatsoever, Borrower shall pay an insufficient funds fee of $25.00.

   d. Borrower shall pay a stop payment charge of $29.00 for each Convenience Check for which a stop payment order has been given. Lender is not obligated to honor any written or oral stop payment order on a Convenience Check unless the stop payment order is made by the signer of that Convenience Check. If any signer gives a stop payment order, that order may be revoked only by that signer. Lender may require Borrower to immediately pay Lender these stop payment charges, or at Lender's option, Lender may charge them to the Line of Credit as an Advance.

14. **Credit Life and Disability Insurance.** Credit life and disability insurance is not required. If such insurance is offered and is in effect, the monthly insurance premium may, at Lender's option, be charged to the Line of Credit as an Advance.

15. **Cancellation.** Either Borrower or Lender may cancel this Agreement for any reason at any time by written notice to the other. Upon cancellation, no further Advances will be made to Borrower, and all amounts owing under this Agreement shall be immediately due and payable. Lender may accept cancellation instructions from any person signing this Agreement on behalf of Borrower.





16. **Security.** Borrower's Line of Credit may be secured by a security interest in certain collateral of Borrower, as may be specified in a separate Security Agreement signed by Borrower.

17. **Guaranty.** Any shareholder, partner or member owning 20% or more interest in Borrower must sign as a personal Guarantor. All persons who sign this Agreement, other than Borrower, are Guarantors. Each Guarantor guarantees the payment of all present and future obligations under this Agreement. The obligations of all Guarantors are joint and several. Lender can collect any obligation from any guarantor without first trying to collect from Borrower or any other Guarantor. Each Guarantor understands and agrees that these documents will apply to all Guarantors even if they do not read them. To the fullest extent permitted by applicable law, each Guarantor will pay all legal expenses and other expenses in connection with enforcing the Line of Credit and this Guaranty. No Guarantor's liability under this Guaranty will be affected by the fact that (1) any other person guarantees or does not guarantee, (2) Lender releases or settles with or does not proceed against Borrower or any Guarantor, (3) the terms of the Line of Credit are changed (including an increase in amount) with or without notice to the Guarantor, or (4) Borrower may have any defense against paying. Each Guarantor grants to Lender a security interest in all deposit accounts with Lender, with U.S. Bank National Association or with any affiliated bank to secure all obligations of the Guarantor to Lender.

Lender may also require other Guarantors. The Each Guarantor shall from time to time execute such guaranties, and in such form as Lender requires; provided, that each Guarantor shall be deemed to have guaranteed the guaranteed amounts whether or not he or she shall have signed a separate guaranty. Each Guarantor authorizes Lender to: (a) obtain credit and employment information about such Guarantor; (b) obtain credit reports and make inquiries pertaining to such Guarantor which Lender considers appropriate from time to time in connection with the Line of Credit; (c) make Lender's experience with Guarantor and Borrower's Line of Credit available to credit bureaus, other Guarantors, Lender's affiliates and persons who have or expect to have financial dealings with such Guarantor; (d) share collection information with such Guarantor's other creditors; and (e) disclose information as required by law. Each Guarantor waives, to the fullest extent possible under applicable law, all surety-ship defenses available to a surety and agrees that the guaranteed obligation shall be a direct obligation of Guarantor on default. Each Guarantor also hereby waives all benefits and protections under Arizona Revised Statutes Sections 12-1641 through 12-1644.

The terms in this paragraph apply only to Guarantors residing in Kentucky: Notwithstanding the provisions of this Agreement, the maximum aggregate liability of each guarantor under this Guaranty shall not exceed the loan amount requested by the Borrower in this Agreement ("Guaranteed Principal"), plus all interest accruing on and fees and charges relating to the Guaranteed Principal and costs of collecting the Guaranteed Principal or otherwise enforcing the Lender's rights under this Guaranty, including reasonable attorneys' fees and expenses (collectively the "Guaranteed Obligations"). Such Guarantor's obligations shall remain in full force and effective until, and shall terminate (as used in Kentucky Revised Statutes 8371.065, as amended) on the earlier of (a) the day following the date of payment in full upon maturity of the Guaranteed Obligations; or (b) 7 years after the date of this Agreement, but any such termination of the Guaranty shall not affect the liability of the guarantor with respect to Guaranteed Obligations created or incurred prior to such termination date ("Prior Obligations") or extensions or renewals of, interest accruing on, or fees, costs or expenses incurred with respect to, such Prior Obligations prior to, on or after such termination date.

We may report information about your account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your personal credit report.

18. **Other Agreements**
   a. **Inspection.** Borrower shall permit any authorized representatives of Lender at any reasonable time and from time to time to visit and inspect any of the properties of Borrower and to examine, inspect, make copies, and take extracts from Borrower's books and records.
   b. **Compliance with Laws.** Borrower shall comply with all applicable federal, state, regional and local laws, regulations and ordinances and shall maintain all licenses, permits and authorizations required for the conduct of its business.
   c. **No Change of Business.** Borrower, without the written consent of Lender, shall not make any substantial or material change in the nature of Borrower's business.
   d. **Additional Acts.** Borrower shall and shall cause each Guarantor to, from time to time, provide such information, execute such documents and do such acts as may reasonably be required by Lender in connection with any of Borrower's or any Guarantor's obligations under this Agreement.

19. **Credit Review.** Lender may periodically review Borrower's creditworthiness. In doing so, Lender may review credit reports on both Borrower and any Guarantors, and other credit information that the Lender believes to be relevant. Lender may request, and Borrower and all Guarantors agree to provide, any information regarding Borrower's or any Guarantor's financial condition and business operations, which Lender believes appropriate. Based on such information and any other information which Lender, in its reasonable discretion, determines to be relevant, Lender may determine a credit score (a "Credit Score") for the Line of Credit account that Lender reasonably believes to be statistically correlated with the probability of default, provided only that Lender shall use the same method for determining Credit Scores for all accounts in a group which Lender, in its sole discretion, reasonably determines to include Borrower's Line of Credit account. Lender may, in its sole discretion, elect to use a Credit Score provided by a third party vendor chosen by Lender. Based wholly or in part on such information or on a Credit Score, Lender may do any one or more or all of the following: (i) reduce or increase the Credit Limit, (ii) refuse to make any Advance, or (iii) raise or lower the interest rates (including margins) and/or fees. This section does not limit Lender's right under paragraph 3 above or elsewhere in this Agreement to refuse to make any Advance at any time for any reason or no reason or Lender's right under paragraph 6 above or elsewhere in this Agreement to demand payment at any time for any reason or no reason.

20. **Rights of Lender.** No waiver of any of Lender's rights shall be effective unless the waiver is in writing and signed by Lender. No delay or omission by Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver on one occasion shall not prejudice Lender's right to require compliance with all provisions of this Agreement on any other occasion. All Lender's rights and remedies shall be cumulative and may be exercised singularly or concurrently.

21. **Change of Terms.** To the extent permitted by applicable law, Lender may change any of the terms of this Agreement (including without limitation any finance charge rates and any fees) at any time by giving Borrower at least 21 days written notice before the effective date of change. Except as the law may provide otherwise, changes of terms will apply to all Advances outstanding at the time the changes are effective, as well as to future Advances.

22. **Check Access.** Borrower must notify Lender immediately if any of Borrower's Convenience Checks are lost or stolen. Lender will not return canceled Convenience Checks to Borrower. Rather, Lender's Check Safekeeping Service will apply. Under Check Safekeeping, Lender will make an image of each canceled Convenience Check. The image will be retained by Lender for seven years. Borrower may obtain copies of canceled Convenience Checks upon request. If Lender cannot provide Borrower with a copy of any canceled Convenience Check or satisfy Borrower through other means, Borrower agrees that Lender will not be liable for more than the face amount of the Convenience Check or actual damages incurred by Borrower, whichever is less, provided, however, that in no event will Lender be liable for indirect, special or consequential damages. Lender will have no liability for failure to provide a copy of any canceled Convenience Check, which is requested by Borrower after seven years from the date that Convenience Check was presented to Lender. Borrower agrees to examine all periodic statements within thirty (30) days after they are mailed, delivered or otherwise made available to Borrower, and Borrower will notify Lender in writing within that period of any discrepancies therein. Borrower agrees that by mailing, delivering or otherwise making available periodic statements to Borrower and by retaining images of canceled Convenience Checks and providing copies of them to Borrower upon request as provided herein, Lender shall have no liability for and shall not be responsible for any discrepancy, including forged or missing signatures, alterations and counterfeiting, if such discrepancy is not reported to Lender within thirty (30) days after the periodic statement including that discrepancy was mailed, delivered or otherwise communicated to Borrower. Except as modified herein, the Uniform Commercial Code and other applicable laws and rules that apply to regular checks shall apply to the Convenience Checks.

23. **Use of Card.** Borrower agrees to the following terms concerning the use of the Card to access Advances.
   a. **Authorized Use.** Borrower agrees not to give the Card to anyone other than those authorized to request Advances under this Agreement. If Borrower gives the Card to someone else, Borrower will be responsible for any Advances obtained by that person through use of the Card.
   b. **Lost or Stolen Card.** Borrower agrees to notify Lender immediately if the Card is lost or stolen, or if there is possible unauthorized use of the Card. Borrower will notify Lender at:
      U.S. Bank National Association ND
      P.O. Box 6353
      Fargo, ND 58125-6353
      Or by calling: 1-800-673-3555

   If the Card is reported lost or stolen, Lender has the right to close the Line of Credit and request return of all access devices, including the Card, in which case the Line of Credit may be opened under a new account number and with new access devices. Borrower will not be liable in excess of $50 for any loss, theft, or unauthorized charges incurred through use of the Card that occur after Borrower notifies Lender.

Page 3 of 7

Form #ACAP CFAWEUSBR01 04/2008




c. **Limits on Transfers.** For security reasons, Lender may place limitations on the number and amount of Advances Borrower may perform with the Card during a 24-hour period. Lender reserves the right to cancel or block Borrower's use of the Card for any reason, with or without prior notice. Reasons for suspension of Card access may include, for example, detection of suspicious or fraudulent activity, lack of use, misuse, or the return of the Card as undeliverable by the postal service.

d. **Currency Conversions.** Borrower may use the Card for retail purchases at foreign (outside the United States) merchants and for cash withdrawals from foreign ATMs that bear either the PLUS System or VISA logos. At an ATM that bears only the PLUS System logo (and no VISA logo), the charge will be converted into U.S. dollars at the exchange rate established, from time to time by the operator of that ATM PLUS System will then increase the dollar-converted amount by one percent. At a merchant or an ATM that bears the VISA logo (and no PLUS System logo), the charge will be converted into U.S. dollars at the exchange rate established, from time to time, under the applicable bylaws of VISA. At an ATM that bears both the VISA or PLUS System logos, the ATM operator will determine whether to send the transaction over the VISA or PLUS System network using such network's respective currency conversion rules. Borrower understands that the exchange rate in effect when the charge is processed may differ from the rate in effect on the date of the transaction or posting to Borrower's account. The amount of the transaction in dollars if processed through VISA (under its current bylaws and rules) will be the amount of the foreign currency times (i) a rate selected by VISA from the range of rates available in wholesale currency markets for the applicable central processing date, which the rate may vary from the rate VISA itself receives, or (ii) the government-mandated rate in effect for the applicable central processing date; in each of the above instances plus two percent (2%) and/or one percent (1%) times the resulting dollar amount. The 2% fee will appear on Borrower's statement as "Currency Exchange Fee" and the 1% fee as "Foreign Transaction fee." The 1% "Foreign Transaction Fee" may be assessed on all transactions in which the merchant is located in a country other than the United States, even in transactions that do not require currency to be converted.

24. **Notices.** Except as otherwise provided herein, all notices required or permitted to be given by Borrower or Lender under this Agreement shall be deemed to have been given when personally delivered or three (3) business days after deposit with the U.S. Postal Service, postage pre-paid. Notices shall be addressed to Borrower at the address listed on Lender's records. Notices to Lender shall be addressed to Lender at such address as Lender from time to time designates in writing.

25. **Successors and Assigns.** This Agreement shall be binding on and shall inure to the benefit of Borrower and Lender and their respective heirs, successors, and assigns. Notwithstanding the foregoing, Borrower may not assign or transfer its interests under this Agreement without the prior written consent of Lender.

26. **Joint Liability.** Each person who is a Borrower shall be jointly and severally liable for all Advances and other amounts owed to Lender under this Agreement. Each reference to Borrower in this Agreement shall be deemed to refer to each person who is a Borrower.

27. **Waiver; Consent.** Each Borrower waives diligence, demand, presentment for payment, notice of non-payment, protest, and notice of protest. Without notice to any Borrower and without diminishing or affecting Lender's rights or any Borrower's obligations hereunder, Lender may deal in any manner with any person who at any time is liable for, or provides any real or personal property collateral for, any indebtedness of Borrower to Lender, including the Advances. Without limiting the foregoing, each Borrower waives all defenses based on suretyship or impairment of collateral and agrees that Lender may, in its sole discretion: (a) make secured or unsecured Advances to Borrower and agree to any number of waivers, modifications, extensions and renewals of any length of such Advances, including the Advances; (b) impair, release (with or without substitution of new collateral) and fail to perfect a security interest in or to preserve the value of, any collateral provided by any person; and/or (c) sue, fail to sue, agree not to sue, release, and settle or compromise with any person.

28. **Costs and Attorney Fees.** To the fullest extent permitted by applicable law, Borrower agrees to pay Lender on demand all costs, expenses and attorney fees incurred by Lender in connection with the administration and enforcement of this Agreement and the Line of Credit, including, without limitation, all costs and attorney fees incurred in collecting any amounts due to Lender, whether incurred before or after commencement of litigation or at trial, on appeal or in any other proceeding.

29. **Governing Law.** Except to the extent Lender has greater rights or remedies under federal law, this Agreement shall be governed by and construed and enforced in accordance with the laws of the State of North Dakota without regard to conflicts of law principles. Lender may at any time without notice to or consent of Borrower or any Guarantor transfer the Line of Credit to any other Lender, and the term "Lender" shall, from the time of such transfer, refer to that other lender to which the Line of Credit is transferred. In the case of such a transfer, this Agreement shall be governed by the law of a state where that other Lender is located as determined by that other Lender under federal law.

30. **Borrower and Guarantor Authorization.** Borrower and each Guarantor authorizes Lender to: (a) obtain credit and employment information about Borrower and Guarantor; (b) obtain credit reports and make inquiries Lender considers appropriate from time to time in connection with the Line of Credit; (c) make Lender's experience with Borrower's Line of Credit and Guarantor's Guaranty available to credit bureaus, other Borrowers, Lender's affiliates and persons who have or expect to have financial dealings with Borrower; (d) share collection information with Borrower's and Guarantor's other creditors; (e) disclose information as required by law; and (f) file such financing statements and other documents as may be required to perfect any security interest created by this Agreement, including any separate security agreement given to secure this Agreement.

31. **References.** References to this Agreement shall mean this Agreement as amended, modified, supplemented or extended from time to time and any number of substitutions, renewals and replacements thereof.

32. **Image Processing.** Either Lender or Borrower may create a microfilm or optical disk or other electronic image of this Agreement or any part of this Agreement. They may then destroy the original as part of their normal business practices. A reproduction of this Agreement or part of this Agreement from the image will be the same as the original for all purposes.

33. **Security Interest in Deposit Accounts.** Borrower and each Guarantor grant Lender a security interest (the "Security Interest") in each of their respective Deposit Accounts held now or in the future at Lender or Lender's affiliates (including, without limitation, U.S. Bank National Association) (the "Depositories") to secure all present and future obligations of Borrower or Guarantor or both to Lender under this Agreement. Without limiting the rights of Lender or any Depository under any separate agreement governing the Deposit Accounts, Lender may, at any time Borrower or any Guarantor owes any amount to Lender, apply any funds in any Deposit Account owned by that Borrower or Guarantor to any amounts owed to Lender under this Agreement. Borrower, each Guarantor, and each Depository agree that each Depository will comply with instructions originated by Lender directing disposition of the funds in the respective Deposit Accounts without further consent by either Borrower or Guarantor. By adopting the following symbols for purposes of authenticating this Agreement, the Depositories specifically agree to the control agreement terms set forth in this paragraph as well as acknowledge the terms of this Agreement.




## IMPORTANT NOTICES

NOTICE: IMPORTANT: READ BEFORE SIGNING. THE TERMS OF THIS AGREEMENT SHOULD BE READ CAREFULLY BECAUSE ONLY THOSE TERMS IN WRITING, EXPRESSING CONSIDERATION AND SIGNED BY THE PARTIES ARE ENFORCEABLE. NO OTHER TERMS OR ORAL PROMISES NOT CONTAINED IN THIS WRITTEN CONTRACT MAY BE LEGALLY ENFORCED. THE TERMS AND CONDITIONS OF THE CASH FLOW MANAGER LINE PERMIT THE LENDER TO CHANGE THE TERMS OF THIS WRITTEN CONTRACT UPON WRITTEN NOTICE TO YOU. YOU (THE SIGNER) MAY CHANGE THE TERMS OF THIS WRITTEN CONTRACT ONLY BY ANOTHER WRITTEN AGREEMENT.

IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT: To help the government fight the funding of terrorism and money laundering activities, federal law requires financial institutions to obtain, verify, and record information that identifies each person who opens an account. What this means for you: When you open an account, we will ask for your name, address, date of birth and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents.

MISSOURI NOTICE: ORAL AGREEMENTS OR COMMITMENTS TO LOAN MONEY, EXTEND CREDIT OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT INCLUDING PROMISES TO EXTEND OR RENEW SUCH DEBT ARE NOT ENFORCEABLE, REGARDLESS OF THE LEGAL THEORY UPON WHICH IT IS BASED THAT IS IN ANY WAY RELATED TO THE CREDIT AGREEMENT. TO PROTECT YOU (BORROWER(S)) AND US (CREDITOR) FROM MISUNDERSTANDING OR DISAPPOINTMENT, ANY AGREEMENTS WE REACH COVERING SUCH MATTERS ARE CONTAINED IN THIS AGREEMENT, ANY GUARANTY AND ANY OTHER RELATED DOCUMENT WHICH IS THE COMPLETE AND EXCLUSIVE STATEMENT OF THE AGREEMENT BETWEEN US, EXCEPT AS WE MAY LATER AGREE IN WRITING TO MODIFY IT.

WASHINGTON NOTICE: UNDER WASHINGTON LAW, ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE.

NEBRASKA NOTICE: A CREDIT AGREEMENT MUST BE IN WRITING TO BE ENFORCEABLE UNDER NEBRASKA LAW. TO PROTECT BORROWER AND LENDER FROM MISUNDERSTANDINGS OR DISAPPOINTMENTS, ANY CONTRACT, PROMISE, UNDERTAKING OR OFFER TO FORBEAR REPAYMENT OF MONEY OR TO MAKE ANY OTHER FINANCIAL ACCOMMODATION IN CONNECTION WITH THIS LOAN OF MONEY OR GRANT OR EXTENSION OF CREDIT, OR ANY AMENDMENT OF, CANCELLATION OF, WAIVER OF, OR SUBSTITUTION FOR ANY OR ALL OF THE TERMS OR PROVISIONS OF ANY INSTRUMENT OR DOCUMENT EXECUTED IN CONNECTION WITH THIS LOAN OR MONEY OR GRANT OR EXTENSION OF CREDIT MUST BE IN WRITING TO BE EFFECTIVE.

OREGON NOTICE: UNDER OREGON LAW, MOST AGREEMENTS, PROMISES, AND COMMITMENTS MADE BY LENDERS AFTER OCTOBER 3, 1989, CONCERNING LOANS AND OTHER CREDIT EXTENSIONS THAT ARE NOT FOR PERSONAL, FAMILY, OR HOUSEHOLD PURPOSES, OR SECURED SOLELY BY THE BORROWER'S RESIDENCE, MUST BE IN WRITING, EXPRESS CONSIDERATION AND BE SIGNED BY THE LENDER TO BE ENFORCEABLE.

We may report information about your account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your personal credit report.

## PERSONAL GUARANTY

**Guaranty.** For value received, and to induce the Bank to extend or continue credit to Borrower, the undersigned GUARANTOR ("Guarantor," whether one or more) HEREBY UNCONDITIONALLY AND IRREVOCABLY GUARANTEES PAYMENT OF AND PROMISES TO PAY TO THE BANK THE OBLIGATIONS, whether or not the Obligations are valid and enforceable against Borrower, whenever they become due, whether on demand, at maturity or by reason of acceleration, or at the time the Guarantor shall die or become the subject of any bankruptcy, insolvency or incompetency proceeding. In addition to the Obligations under the above Agreement, for purposes of this Guaranty, the term "Obligations" shall also include all interest, costs and attorneys fees (including fees of inside counsel) incurred by the Bank in attempting to realize upon any collateral securing this Guaranty, or to enforce this Guaranty. The Guarantor agrees that the Bank does not have to take any steps whatsoever to realize upon the Collateral, or proceed against Borrower or any other party before or after proceeding against the Guarantor, and the Guarantor waives any claim of marshalling of assets. The Guarantor also agrees the Bank may renew, amend, modify or extend any existing or future Obligations (including making additional advances, or changing the amount, time or manner of payment of any Obligations), waive compliance with any provisions or documents evidencing any of the Obligations or settle, release, compromise or subordinate any Obligation, any Collateral, any collateral securing this Guaranty, or the liability of any other party responsible for payment of the Obligations. The Guarantor expressly waives all right of setoff and counterclaims, as well as diligence in collection or prosecution, presentment, demand of payment or performance, protest, notice of dishonor, nonpayment or nonperformance of any Obligation. The Guarantor warrants and represents to the Bank that the Guarantor has and will examine the financial condition of Borrower as the Guarantor deems necessary; and specifically relieves the Bank of any duty or responsibility to advise the Guarantor of any change in Borrower's financial condition. The Guarantor grants to the Bank a security interest in all Guarantor's depository account balances,

cash and any other property now or hereafter in the possession of or under the control of the Bank to secure payment under this Guaranty and grants the Bank a contractual right to setoff, without notice or demand, amounts due hereunder against all depository account balances, cash and other property now or hereafter in the possession of the Bank. If this Guaranty has been signed by more than one Guarantor, the obligations of each Guarantor shall be joint and several with all other Guarantors.

**Kentucky Guarantors.** The provisions of this paragraph apply to any Guarantor who resides in the State of Kentucky. Notwithstanding the provisions of this Guaranty, the maximum aggregate liability of the Guarantor under this Guaranty shall not exceed $ _____ ("Guarantied Principal"); plus any and all interest accruing on the Guarantied Principal and all fees, charges and costs of collecting the Guarantied Principal or otherwise enforcing the Bank's rights under this Guaranty, including without limitation, reasonable attorneys' fees and expenses (all of the foregoing hereafter referred to as "Guarantied Obligations"). This Guaranty shall remain in full force and effect until, and shall terminate (as used in Kentucky Revised Statutes §371.065, as amended) on the earlier of (a) the day following the date of payment in full upon maturity of the Guarantied Obligations; or (b) _____, 20___; provided, however, that the termination of this Guaranty on such termination date shall not affect in any manner the liability of the Guarantor with respect to (1) the Guarantied Obligations which are created or incurred prior to such termination date ("Prior Obligations"), or (2) extension or renewals of, interest accruing on, or fees, costs or expenses incurred with respect to, such Prior Obligations prior to, on or after such termination date.

**Third Party Pledge.** For value received, and to induce Bank to extend credit or other financial accommodations now or in the future to Borrower, the Guarantor agrees to pledge any interest Guarantor has or may acquire in the Collateral to secure the Obligations.

The Guarantor and the Bank hereby jointly and severally waive any and all rights to trail by jury in any action or proceeding relating to this Guaranty and the Obligations hereunder; and each represent to the other that this waiver is knowingly, willingly and voluntarily given.

Page 5 of 7

Form #ACAP CFAWEUSBR01 04/2008

  

not applicable

**COMMUNITY PROPERTY CONSENT**
*(Applies to guarantors residing in community property states, such as Arizona, California, Idaho, Nevada, Washington, and Wisconsin)*

**PURPOSE AND CONSENT.** Each Guarantor who is married represents that this obligation is incurred in the interest of his or her marriage or family. The spouse of each Guarantor who has not signed above as a Guarantor consents to the Guarantor entering into this Guaranty, but said spouse of each Guarantor is not a party to the above Guaranty.

Signatures Required.

| Guarantor | Guarantor's Spouse |
|---|---|
| X | X |
| Guarantor | Guarantor's Spouse |
| X | X |
| Guarantor | Guarantor's Spouse |
| X | X |
| Guarantor | Guarantor's Spouse |
| X | X |
| Guarantor | Guarantor's Spouse |
| X | X |

**MARITAL PURPOSE STATEMENT** (To be signed by married Wisconsin residents)

Each Borrower who is married represents that this obligation is incurred in the interest of his or her marriage or family.

X _____ Date: _____
Printed Name: _____

X _____ Date: _____
Printed Name: _____

X _____ Date: _____
Printed Name: _____

X _____ Date: _____
Printed Name: _____

X _____ Date: _____
Printed Name: _____

Page 6 of 7

Form MCAP CFAWEUSBR01 04/2008

## SIGNATURES

By signing this Agreement, each person ("Signer"), individually and on behalf of Borrower, requests the indicated services or credit products from Lender. Each Signer is authorized to sign on behalf of Borrower and will provide business resolutions to Lender upon request. Each Signer has read and agrees to all applicable provisions, including the personal guaranty and grant of a security interest in deposit accounts. Each Signer authorizes Lender to (1) obtain credit records and other credit and employment information about the Signers personally and the Borrower (now and in the future), including from state and federal tax authorities, for deciding whether to approve the requested credit and for later periodic account review and collection purposes, and (2) furnish information about the Borrower and the Guarantors to credit bureaus, other Signers, and other persons who claim to be authorized by Borrower or the Guarantors to receive such information. Borrower and each Signer guaranty that all information in this Agreement is correct and agree to notify Lender if any information changes. All loans shall be used for business purposes only.

BY SIGNING BELOW, EACH SIGNER AGREES TO BE PERSONALLY RESPONSIBLE FOR ANY CREDIT GRANTED PURSUANT TO THIS AGREEMENT. This Agreement constitutes a Guaranty under which each individual signing is a Guarantor, and individually guarantees the payment of all present and future obligations of Borrower to Lender in accordance with the provisions in this Agreement.

IMPORTANT NOTICE: EACH BUSINESS OWNER MUST VERIFY THE INFORMATION BELOW AND SIGN ON BEHALF OF THE BUSINESS AND AS A PERSONAL GUARANTOR.

### Personal Guarantor(s) Information:

Thomas J Hronis
2612 Nottingham Ave ~~Apt# 272~~
Los Angeles, CA 90027
Percent of Ownership: 100.000

Percent of Ownership:

Percent of Ownership:

Percent of Ownership:

Percent of Ownership:

| Signature of Business Owner & Guarantor | Printed Name | Title | Date |
|---|---|---|---|
|  | Thomas J Hronis |  PRESIDENT  | 07/29/2008 |
| Signature of Business Owner & Guarantor | Printed Name | Title | Date |
| Signature of Business Owner & Guarantor | Printed Name | Title | Date |
| Signature of Business Owner & Guarantor | Printed Name | Title | Date |
| Signature of Business Owner & Guarantor | Printed Name | Title | Date |

/s/ U.S. Bank National Association ND, for itself and its successors and assigns
/s/ U.S. Bank National Association, for itself and its successors and assigns

077-1105 (04/08R) ©2007 U.S. Bancorp U.S. Bank Member FDIC

**PROOF OF SERVICE**

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I, Joseph Cardella, am employed in the County of Los Angeles, State of California. I am over the age of eighteen and not a party to the within action. My business address is:
3324 Seaclaire Drive
Rancho Palos Verdes, CA 90275.

On September 6, 2012, I served the foregoing documents described as:

**FIRST AMENDED COMPLAINT FOR:**
**1) BREACH OF CONTRACT; 2) NEGLIGENT VIOLATION OF FAIR CREDIT REPORTING ACT; 3) HARASSMENT; 4) INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

on all interested parties in this action by placing [X] a true copy [ ] the original thereof enclosed in sealed envelope(s), at Rancho Palos Verdes, California, addressed as follows:

**Counsel for Defendants,**
**U.S. BANCORP**

Patrick J. Hagan
BRIAN CAVE, LLP
800 West Olympic Blvd., 4TH Floor
Los Angeles, CA 90015
Email: Patrick.Hagan@bryancave.com

[X] **BY REGULAR MAIL:** I deposited such envelope in the mail at Rancho Palos Verdes, California. The envelope was mailed with postage thereon fully prepaid. I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Rancho Palos Verdes, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one (1) day after date of deposit for mailing in affidavit.

[ ] **BY PERSONAL SERVICE** - I caused such envelope to be delivered to the address set forth above.

[ ] **BY FACSIMILE:** I faxed said document, to the office(s) of the addressee(s) shown above, and the transmission was reported as complete and without error.

[ ] **BY ELECTRONIC TRANSMISSION** - I transmitted a PDF version of this document by electronic mail to the party(s) identified on the attached service list using the e-mail address(es) indicated.

[ ] (State) I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

[X] (Federal) I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on September 6, 2012, at Rancho Palos Verdes, California.

_____
Joseph A. Cardella